IN RE the MARRIAGE OF:
William LUTZKE (Deceased), by his Personal
Representative, William J. Lutzke, Jr.,
Petitioner-Appellant,

v.

Vallerie LUTZKE, Respondent.

Supreme Court

*No. 83–1197. Argued October 1, 1984.—
Decided January 31, 1985.*

(Also reported in 361 N.W.2d 640.)

For the petitioner-appellant there were briefs by *Michael A. Loduha*, Manitowoc, and oral argument by *Mr. Loduha.*

For the respondent there was a brief by *Ron A. Kaminski, Manitowoc,* and oral argument by *Mr. Kaminski.*

HEFFERNAN, CHIEF JUSTICE.   This is an appeal from an order of the circuit court for Manitowoc county dismissing a petition of the personal representative of William Lutzke, William J. Lutzke, Jr., asking the court to find William's divorced wife, Vallerie, in contempt for failure to join in the sale of real estate jointly held

by William and Vallerie during their marriage; or, in the alternative, for an order to modify the divorce judgment to provide that Vallerie now be ordered to sell the property.[1]

The circuit judge, Leon H. Jones, dismissed the petition because he concluded that the title status of the property was, as a matter of law, not affected by a divorce decree; hence, despite the direction of the divorce court to sell the property and then divide the proceeds, the joint tenancy persisted following the divorce and, upon the death of William, Vallerie became the sole title holder by right of survivorship.

Because we conclude that, whether a joint tenancy persists following a divorce is dependent either upon the intent of the parties to the divorce as evidenced in the proceedings or upon the subjective or manifested intent of the divorce judge, the trial court erred in its conclusion that a joint tenancy persists as a matter of law unless the sale of the property directed by the divorce judgment is in fact exercised. While it appears from the record that the parties had no express intent in respect to the severance of the joint tenancy, we are in doubt whether the trial judge at the time of the judgment intended to sever the tenancy. On the date of the order dismissing the petition of the personal representative, the trial judge assumed, erroneously we conclude, that the law of this state provided that, where there was a divorce judgment directing the sale of joint property, no severance of the tenancy would be effective until the sale.

We therefore vacate the order of the circuit court and remand the cause to the circuit court to give the judge thereof opportunity to clarify and construe his intention at the time of the decree. Did he or did

---

[1] We have accepted this appeal pursuant to the certification of of the court of appeals, sec. (rule) 809.61, Stats.

he not intend to effect a severance at the time of the divorce judgment. In the event immediate severance was intended, the parties thereupon became tenants in common, and each of them acquired a separate estate in the property, which could be conveyed to third parties or be the subject of inheritance and no longer subject to the other co-tenant's right to acquire title to the entire property by survivorship. Additionally, the question is posed whether, if Vallerie acquired the estate by survivorship, she nevertheless was obligated financially by other terms of the judgment and those obligations were charges upon the land.

The basic facts are these. William Lutzke and Vallerie Lutzke, after a thirty-year marriage, were divorced in the circuit court (family court branch) of Manitowoc county. Findings of fact, conclusions of law, and the judgment of divorce were dated November 24, 1982. The findings of fact state that: "The parties are the owners of a home located [at] 4731 Highway 141, Manitowoc, Manitowoc County, Wisconsin . . . ."

By the following language, the judgment ordered the parties to sell the home and divide the proceeds:

"7. PROPERTY DIVISION—Real Estate

"That the home of the parties . . . is to be listed and sold and that the net proceeds of said sale are to be divided between the parties equally subject to the following exception:

"(a) That the petitioner husband is first to receive the sum of $3,000.00 from the net sale proceeds in full satisfaction and as a return of the traceable part of inheritance as received during the course of the marriage.

"(b) That the Guardian ad Litem's fee as submitted to the Court and approved by the Court as fair and reasonable is to be paid from the proceeds of the sale of the house one-half by each party noting that the petitioner is to receive a credit of $100.00 due to previous payments to the Guardian ad Litem. In addition, to the

extent not previously paid at time of sale of the house, the attorneys fees for the respective parties shall be paid from the sale proceeds directly.

"(c) That any portion of the $500.00 loan together with interest as made by the Petitioner to the Respondent during the course of this action, if the same has not been applied to any arrearage of record or otherwise paid back shall be paid back to the petitioner from the respondent's share of the proceeds."

The judgment does not expressly sever the joint tenancy, nor does it state the form of ownership of the home. Although the fact of joint tenancy is not expressly set forth in the proceedings, it is assumed by all of the parties that William and Vallerie were joint tenants of the homestead property. The divorce judgment made no provision for the possession of the home pending sale, although the temporary order, issued January 25, 1982, by the family court commissioner, ordered the wife to vacate the residence and granted the husband the use of household furnishings and effects. The record shows he was in occupancy until his death.

The divorce judgment did not specify a price nor a time limit for the sale of the home. The house was appraised in April, 1982, at a market value of $44,500. The appraiser noted on his report that "[t]he present condition will make it very difficult to achieve a fair market sale here." The equalized value of the house, based on its assessed value in 1981, was $44,826.

On April 22, 1982, William and Vallerie Lutzke executed a listing contract with a real estate broker, listing the house for sale at $45,800. Vallerie Lutzke testified at the show cause hearing, which is the subject of this appeal, that no offers were received on this listing contract.

At a later time a listing contract with a different broker was executed by William Lutzke alone. According to the testimony of the real estate sales agent and

■

Vallerie Lutzke, Vallerie Lutzke refused to sign the second contract. This second contract does not appear in the record, but Judge Jones' memorandum decision and order dismissing the "show cause" motion states that the second contract listed the house for sale at $41,900.

William Lutzke died on March 27, 1983. On April 10, 1983, an offer to purchase the house for $35,000 was received. On April 12, 1983, William Lutzke's son, William J. Lutzke, was appointed special administrator of the estate, with directions by the court to adminster the estate in accordance with:

"the preservation of the estate and securing the property until the personal representative can be appointed and in addition, an offer to purchase on the real estate of the deceased Wm. N. Lutzke has been received and proper steps need to be taken to secure the estate's interest in the sale of said residence."

Within the next several days, the special administrator filed an action in Manitowoc County Circuit Court, captioned "Order to Show Cause Why the Judgment of Divorce Should Not be Modified." This document is dated April 14, 1983, and stamped "filed" on April 19, 1983. This order or motion demands that Vallerie Lutzke appear before Judge Leon Jones on April 19, 1983, to:

"show cause . . . why the Judgment of Divorce should not be modified to compel the respondent [Vallerie Lutzke] to sell the homestead of the parties or in the alternative why the respondent should not be held in contempt for failing to reasonably pursue the homestead of the parties as ordered; and why the respondent should not be ordered to pay the costs of this action."

An affidavit of the special administrator, in support of the "show cause order" and an affidavit of Vallerie Lutzke's attorney, in opposition to the order, both state that Vallerie Lutzke rejected the $35,000 offer to purchase the home.

Except for a preliminary defense, soon abandoned, that the circuit court, family branch, did not have jurisdiction, Vallerie's principal defense was that, because the court's judgment of divorce did not sever the joint tenancy, upon the death of co-tenant, William, she became the sole owner by right of survivorship and, therefore, had no obligation to sell. The position of William's estate was that the joint tenancy had been severed by the decree and, because thereafter he was owner of one-half of the property as a tenant in common, that, under the divorce decree, Vallerie's share of the co-tenancy was subject to a lien, equitable in nature, to secure payment of William's traceable $3,000 inheritance, a $500 loan, the guardian *ad litem* fees, and the attorney's fees. He also appears to argue that if, by some ratiocination, this court should conclude the entire joint property passes to Vallerie by survivorship, the property is, in accordance with the intent of Judge Jones, charged with the payment of one-half the value of the real estate to William's estate and is also subject to liens for the inheritance, loan, attorney's fees, and guardian *ad litem* fees.

The circuit judge in his memorandum decision concluded that the divorce judgment "did not in terms divest or transfer the real estate." He recognized, however, that *Westerlund v. Hamlin,* 188 Wis. 160, 205 N.W. 817 (1925), employed an analysis relying upon the intent of the trial judge at the time of the divorce judgment. Thus, Judge Jones acknowledged that there was Wisconsin authority that the trial judge's intent was relevant in determining whether the judgment in itself had the effect of terminating a joint tenancy. His analysis of *Westerlund* (with which we partially disagree) was that the language in respect to intent was not controlling, for there this court concluded that, because under the law there could not be a division of property

and an award of alimony—and there clearly was an award of alimony—it could not have been the intent of the judge to do an unlawful thing. Hence, it was not the intent of the trial court in *Westerlund* to divide the property and terminate the joint tenancy. Judge Jones viewed this as a declaration that the *Westerlund* rationale was "jurisdictional," *i.e.*, once the alimony was awarded, the trial court did not have jurisdiction to divide the property. While we do not disagree with Judge Jones that *Westerlund* stands for that proposition, we nevertheless disagree that such is the only holding of *Westerlund* and conclude that it also stands for the proposition that, irrespective of the intent of the parties, the discernible intent of the divorce judge regarding severance of a joint tenancy will be given that effect—assuming, of course, that that determination is based upon acceptable guides to the exercise of judicial discretion.

The trial judge also placed great reliance on *Nichols v. Nichols,* 43 Wis. 2d 346, 168 N.W.2d 876 (1969). *Nichols* involved a divorce situation where the judgment expressly provided that the joint tenancy was to continue for two years unless the parties gave their mutual assent to the sale. Thereafter, either party was given the authority to sell its respective interest. The property remained in possession of the divorced wife following the judgment. Eleven years later, when the husband died, the property had not been sold. It was asserted by his estate that the divorce judgment itself severed the tenancy and, hence, the deceased husband from the date of the judgment held as a tenant in common. The wife asserted that all that the judgment did was to provide for the continuation of the joint tenancy until the power of sale, effective after two years, was exercised. This court agreed that the judgment had not severed the joint tenancy. Judge Jones, in the instant case, relied upon *Nichols* for his statement of the law:

"The law at present appears to be that an unexercised order to sell a joint tenancy in land does not sever the same."

The holding of *Nichols*, however, we find to be considerably less sweeping. The holding under the facts there at issue was:

"[A] divorce decree directing that the parties continue to hold real estate as joint tenants with the right of possession given to one does not in itself sever the joint tenancy." *Nichols*, 43 Wis. 2d at 351.

Vallerie Lutzke also would expand the scope of the holding of *Nichols*. She builds her argument around the following sentence in *Nichols:*

"The unexercised power to sell or convey a joint tenancy interest does not sever the joint tenancy; a consummated sale or conveyance does." *Nichols*, 43 Wis. 2d at 350.

The statement, while clearly correct, is a general truism universally pertinent to joint tenancy law. A joint tenant, absent some prohibition of a specific nature, always has the power to sell his or her interest. Clearly, the existence of that power implicit in every joint tenant is irrelevant to the severance in the context of this case.

*Nichols* is simply not appropriate to the situation here. In *Nichols*, it is clear that the judgment expressly contemplated and intended the continuance of the joint tenancy until there had been a severance by sale. In the present case, the question is whether there was an intent to sever the joint tenancy absent the sale. In *Nichols*, the question was: Did the grant of possession to one tenant sever the joint tenancy as a matter of law when the trial judge did not intend such result. *Nichols* settled the latter point—simultaneous and equal possession is no longer a necessary ingredient of a joint tenancy. Hence, the issue in *Nichols* is not an issue

here. The fact that William Lutzke was in sole possession of the premises following the divorce decree is not dispositive of whether the joint tenancy continued to exist. *Nichols,* however, does not control this case. It is inapplicable. The court of appeals in its certification recognized this possibility. It pointed out:

"If our expansive reading is incorrect, an examination and explanation of what *Nichols* stands for would be necessary because the factual differences between *Nichols* and this case might then become significant."

The court of appeals in its certification to this court accepted the proposition that *Nichols* had established that:

"[A] divorce judgment by itself does not sever ownership in property jointly held by the parties unless it specifically and affirmatively provides for severance of such interests."

We believe that this interpretation, denominated by the court of appeals as "expansive," is too much so. Rather, the converse was decided by *Nichols.* Because the joint tenancy "was specifically and affirmatively" preserved by the judgment, the appropriate proposition of law is merely that the joint tenancy under those circumstances, the controlling facts of *Nichols,* continues.

It was, however, upon its view of *Nichols* that the court of appeals posed the question for which certification to this court was sought.

The court of appeals accepted the proposition that severance was not required under its reading of *Nichols.* It also pointed out that the divorce statutes at the time of *Nichols* did not mandatorily order a division of property while, arguably at least, the present statutes do.[2]

---

[2] Sec. 247.26, Stats. 1975: This was replaced by sec. 767.255, Stats. 1977.

The salient language in sec. 247.26, Stats. 1975, is that "The court *may* also finally divide and distribute the estate . . . ." (Emphasis supplied.) The parallel lan-

"247.26 **Alimony, property division.** Upon every judgment of divorce or legal separation, the court may, subject to s. 247.20, further adjudge for a limited period of time to either party such alimony out of the property or income of the other party for support and maintenance, except no alimony shall be granted to a party guilty of adultery not condoned, and the court may further grant such allowance to be paid by either or both parties for the support, maintenance and education of the minor children committed to the other party's care and custody as it deems just and reasonable. The court may also finally divide and distribute the estate, both real and personal, of either party between the parties and divest and transfer the title of any thereof accordingly, after having given due regard to the legal and equitable rights of each party, the length of the marriage, the age and health of the parties, the liability of either party for debts or support of children, their respective abilities and estates, whether the property award is in lieu of or in addition to alimony, the character and situation of the parties and all the circumstances of the case; but no such final division shall impair the power of the court in respect to revision of allowances for minor children under s. 247.25. A certified copy of such judgment which affects title to real estate shall be recorded in the office of the register of deeds of the county in which the lands so affected are situated.

"History: 1971 c. 220; 1973 c. 12 s. 37."

Repealed and recreated Laws of 1977, ch. 105, sec. 42.

Sec. 767.255, Stats. 1979–80:

"767.255 **Property division.** Upon every judgment of annulment, divorce or legal separation, or in rendering a judgment in an action under s. 767.02(1)(h), the court shall divide the property of the parties and divest and transfer the title of any such property accordingly. A certified copy of the portion of the judgment which affects title to real estate shall be recorded in the office of the register of deeds of the county in which the lands so affected are situated. The court may protect and promote the best interests of the children by setting aside a portion of the property of the parties in a separate fund or trust for the support, maintenance, education and general welfare of any minor children of the parties. Any property shown to have been acquired by either

guage in the more recent statute is ". . . the court *shall* divide the property of the parties and divest and

party prior to or during the course of the marriage as a gift, bequest, devise or inheritance or to have been paid for by either party with funds so acquired shall remain the property of such party and may not be subjected to a property division under this section except upon a finding that refusal to divide such property will create a hardship on the other party or on the children of the marriage, and in that event the court may divest the party of such property in a fair and equitable manner. The court shall presume that all other property is to be divided equally between the parties, but may alter this distribution without regard to marital misconduct after considering:

"(1) The length of the marriage.

"(2) The property brought to the marriage by each party.

"(2r) Whether one of the parties has substantial assets not subject to division by the court.

"(3) The contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services.

"(4) The age and physical and emotional health of the parties.

"(5) The contribution by one party to the education, training or increased earning power of the other.

"(6) The earning capacity of each party, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage.

"(7) The desirability of awarding the family home or the right to live therein for a reasonable period to the party having custody of any children.

"(8) The amount and duration of an order under s. 767.26 granting maintenance payments to either party, any order for periodic family support payments under s. 767.261 and whether the property division is in lieu of such payments.

"(9) Other economic circumstances of each party, including pension benefits, vested or unvested, and future interests.

"(10) The tax consequences to each party.

"(11) Any written agreement made by the parties before or during the marriage concerning any arrangement for property.

transfer the title of any such property accordingly."
(Emphasis supplied.)

Thus, the court of appeals poses the question whether
the result and rationale of *Nichols* is appropriate now.
Its petition for certification points out that this statutory
language was enacted subsequent to *Nichols* and asks
whether, arguably at least, the new language "now
require[s] a judge to sever property jointly held between
the parties, or in the absence of such affirmative action,
must a judgment of divorce be read to work [as a matter
of law] a severance of pre-divorce joint tenancy in-
terest."

We answer both portions of that question in the nega-
tive. The severance of a pre-divorce joint tenancy is not
mandatory, and we need not construe ambiguous divorce
judgment determinations to be declarative of a sever-
ance of pre-existing joint tenancy.

We note the following reasons for concluding that
sec. 767.255, Stats., does not mandatorily require a di-
vorce judge to terminate a joint tenancy.

That statute, and indeed the entire family code, is
designed to enable a divorce judge to make a flexible and
tailored response to the needs of a particular divorcing
family. Sec. 767.255, Stats., lists thirteen different
factors which a court should consider in making a prop-
erty division. The last factor is a catch-all that clearly
makes it possible for the divorce judge to take into
account any other factors that the court may determine

distribution; such agreements shall be binding upon the court
except that no such agreement shall be binding where the terms
of the agreement are inequitable as to either party. The court
shall presume any such agreement to be equitable as to both
parties.

"(12) Such other factors as the court may in each individual
case determine to be relevant.

"History: 1977 c. 105; 1979 c. 32 ss. 50, 92(4) ; 1979 c. 196."

to be "relevant." It is obvious that property may be divided unequally if the equities of the case and the needs of the family so indicate.

In the case of *In re Marriage of Lundberg,* 107 Wis. 2d 1, 318 N.W.2d 918 (1982), this court interpreted the maintenance and property provisions of the family code—the Divorce Reform Act, ch. 105, Laws of 1977—as creating "a progressive and flexible method" of dividing assets to achieve a just result. 107 Wis. 2d at 15. It would be inconsistent with the general criteria of the statute and inconsistent with the purpose of the Reform Act to conclude that there must be a severance of the joint property as a necessary ingredient of every divorce decree.

Specific portions of sec. 767.255, Stats., appear to be geared to the fact that the court may alter any presumption of equal division of property. *E.g.,* sec. 767.255 (7) provides the court may consider, "The desirability of awarding the family home or the right to live therein for a reasonable period to the party having custody of any children."

This subsection contemplates awarding possession and use of a home to one who is not a sole owner. This makes it possible to give possession to a custodial parent while ownership continues in joint tenancy or in the other parent.

Also looking to the dictionary meaning of the word, "divide"—as therein defined—it does not reasonably imply that all joint interests be severed. Both Webster's Third New International Dictionary and Black's Law Dictionary define "divide" as synonymous with "distribute."

Sec. 767.255, Stats., in its opening paragraph uses the word, "divide," as a synonym for "distribute." The last sentence of that opening paragraph recites:

"The court shall presume that all other property is to be *divided* equally between the parties, but may alter this *distribution* . . . ." (Emphasis supplied.)

Hence, it is apparent that the word, "divide," does not mean to separate or to allocate equal shares. It merely means that the assets of the marriage shall be allocated or distributed in accordance with the court's exercise of discretion after considering the pertinent and relevant factors.

Also, the statute provides that in the case of every "judgment of . . . divorce . . . the court shall divide the property of the parties and divest and transfer the title of any such property *accordingly*." (Emphasis supplied.)

It seems clear that the division of assets and transfer of any title is to be in accordance with the provisions of the judgment and the judgment need not, in all cases, provide for equal division or severance of all of the rights in the assets of the marriage.

We conclude that the particular language change in the property division statute, subsequent to *Nichols,* and relied upon by the court of appeals, is irrelevant to the question at hand, particularly in view of the policy noted —that the legislature desired to confer the power of flexible response upon a divorce judge to allocate assets in a manner most likely to fit the needs of the particular family.

The court of appeals did not point out any rationale, other than the change in verbiage of the statute, for a position favoring an absolute severance of any interlocking property ties between the parties to the dissolved marriage. Yet, some states, as a matter of policy, have concluded that the breaking of the bonds should be absolute and that it is therefore necessary to dissolve property ties, as well as the ties of matrimony—that it is desirable to eliminate any continued inter-relationship

between the parties and to avoid the continuation of friction points and possibly acrimonious litigation. Such is the policy adopted by our sister state, Minnesota. In *Snyder v. Snyder*, 298 Minn. 43, 50, 212 N.W.2d 869 (1973), the Minnesota Supreme Court quoted with approval an earlier case decided by that court:

" 'The thrust of our more recent decisions touching upon the issue before us, however, is to severely limit the continuation of undivided interests in property acquired by divorced parties during coverture. With respect to such property the court shall, wherever possible, determine the issue of division of the property with finality, as contemplated by Minn. St. 518.64.' " (quoting *Wos v. Wos*, 291 Minn. 404, 406, 191 N.W.2d 829 (1971)).

The North Dakota Supreme Court, however, rejected this rationale as a sufficient reason to interpret statutory property division provisions of North Dakota as severing joint tenancies. *Renz v. Renz*, 256 N.W.2d 883 (ND 1977). In *Renz,* the North Dakota Supreme Court stated:

"Again, some of the decisions rely on, or at least refer to, a supposed intention of legislatures to permanently divide the property of divorced persons, presumably so as to avoid further disputes between them. Such references may be found in *Leutgers v. Kasten* [295 Minn. 545, 204 N.W.2d 210 (1973)]; *Snyder v. Snyder, supra;* and *Carson v. Ellis* [186 Kan. 112, 348 P.2d 807 (1960)]. We find no such indication of legislative intention in this State. Our Legislature gives the courts the power to

" '. . . make such equitable distribution of the real and personal property of the parties as may seem just and proper, . . .' Sec. 14–05–24, N.D.C.C.

"We discern no hint of a direction that we should not allow divorced couples to continue to hold property jointly if it seems proper to them or equitable to the court for them to do so." *Renz,* 256 N.W.2d at 885–86.

Like the North Dakota legislature, the Wisconsin legislature has placed flexibility and equity in property divisions ahead of finality. Sec. 767.255, Stats., as stated above, directs the trial court to consider numerous factors in distributing property and implies that the primary legislative objective is a fair and equitable division of property. Thus, it seems clear that the Wisconsin legislature has not adopted a policy which mandates a full and complete separation of all of the property of the spouses upon dissolution of the marriage. Sec. 767.255, Stats., does not reflect a legislative mandate that all property held as co-tenants by persons who are being divorced be severed and allocated to the owners separately.[3]

---

[3] The legislature did speak, however, in respect to the procedure to be followed when there is a divestiture and transfer of ownership in a divorce action. Sec. 767.255, Stats., provides:

"A certified copy of the portion of the judgment which affects title to real estate shall be recorded in the office of the register of deeds of the county in which the lands so affected are situated."

Because the record before us in this case does not reveal an order specifically transferring or divesting ownership of the property, nor a portion of the judgment which could be conveniently recorded in the office of the register of deeds, it could be argued that the divorce judgment as a matter of law did not affect the title to real estate. In the present case, the question, however, is not whether title was transferred as a matter of record, but whether there was a substantive change in the tenancy as the result of the divorce judgment. If there was indeed a divestiture of title intended, and the remand which we order verifies that original intent, the proper recording can be made in the office of the register of deeds. We cannot conclude that the failure of the judge, if it be his duty at all, or the failure of the party to be protected by the recording, would have the effect of defeating the passage of title or the form of ownership. If changed title were the intent but recordation was not effected, the effect would be identical to any other real estate transaction where a conveyance was appropriately made but not appropriately recorded. Sec. 767.255, Stats., does not appear to make clear

We conclude that sec. 767.255, Stats., does not require a judge, as a part of a divorce judgment, to sever property held in joint tenancy, nor does it require that an ambiguous judgment be held to work a severance.

The question in the instant case, then, focuses on whether the divorce court intended to sever the joint tenancy. That statement of the question presupposes that intent is as determinative a factor in the severance of a joint tenancy as it is in respect to the creation of the tenancy.[4] It also presupposes that, in a case where

that a transfer of title, even though explicitly made a portion of a divorce judgment, is not afforded the protection of the recording statutes by the judgment alone. The judgment must be recorded in the office of the register of deeds.

[4] Sec. 700.19, Stats. 1979–80:

"700.19 Creation of joint tenancy. (1) GENERALLY. The creation of a joint tenancy is determined by the intent expressed in the document of title, instrument of transfer or bill of sale. Any of the following constitute an expression of intent to create a joint tenancy: 'as joint tenants', 'as joint owners', 'jointly', 'or the survivor', 'with right of survivorship' or any similar phrase.

"(2) HUSBAND AND WIFE. If persons named as owners in a document of title, transferees in an instrument of transfer or buyers in a bill of sale are described in the document, instrument or bill of sale as husband and wife, or are in fact husband and wife, they are joint tenants, unless the intent to create a tenancy in common is expressed in the document, instrument or bill of sale.

"(3) COMORTGAGEES. If covendors owned realty as joint tenants and a purchase money mortgage names the covendors as mortgagees, the mortgagees are joint tenants, unless the purchase money mortgage expresses an intent that the mortgagees are tenants in common.

"(4) COFIDUCIARIES. Notwithstanding s. 700.18 and subs. (1) to (3), co-personal representatives and cotrustees hold title to interests in property as joint tenants.

"(5) CHANGE IN COMMON LAW REQUIREMENTS. The common law requirements of unity of title and time for creation of a joint tenancy are abolished.

"History. 1971 c. 66."

the intent of the parties is not discernible, the intent of the divorce judge is controlling.

No Wisconsin case directly addresses the question of whether intent to sever a joint tenancy, in the context of a divorce judgment, effects a severance. As Judge Jones recognized in the proceedings in the instant case, *Westerlund v. Hamlin,* 188 Wis. 160, 205 N.W. 817 (1925), assumes the effectiveness of that intent. In that case the intent of the trial judge was assumed to be determinative of whether a divorce decree severed a joint tenancy. This court held that such intent was not shown. Because there was a clear intent to award alimony and the controlling statute did not permit a division of property and an award of alimony, this court concluded that intent to sever the tenancy could not be inferred in that case.

The general rule appears to be that in divorce actions the intent of the parties, if expressed by stipulation or express directive of the court, governs the termination of joint tenancies in marital property. *Mann v. Bradley,* 188 Colo. 392, 535 P.2d 213 (1975); *Watford v. Hale,* 410 So. 2d 885 (Ala. 1982); *Mamalis v. Bornovas,* 112 N.H. 423, 297 A.2d 660 (1972); *Thomas v. Johnson,* 12 Ill. App. 3d 302 (1973); *In re Estate of Woodshank,* 27 Ill App. 3d 444 (1975); *Gaskie v. Hugins,* 640 P.2d 248 (Colo. Ct. App. 1981).

The question then is: What was the intent of the parties in the instant case. It is clear from Judge Jones' memorandum decision that the parties did not enter into a stipulation explicitly severing the tenancy. Judge Jones stated that the parties appeared to have formed no intent, expressly or impliedly, in respect to severance as a part of the divorce itself.

As stated earlier in this opinion, the divorce court never definitively explored the intent of the parties or his own intent when the question of severance of the

joint tenancy was posed at the hearing on the alleged contempt of Vallerie Lutzke. He failed to do so because he relied on *Nichols,* as discussed earlier, that, as a matter of law, the joint tenancy survived until a power of a sale was in fact exercised.

We have concluded otherwise. Severance may be accomplished in the judgment of divorce itself where it can be concluded that it was the intention of the parties or of the court to accomplish such severance. However, Judge Jones apparently concluded that, under his view of the law, the intent of the trial judge was not relevant. He relied upon *Westerlund,* however, for the intimation that perhaps the trial judge's, his own, intent might be controlling even in the present case if "the intent of the trial court is material."

Thus, Judge Jones' statement that *Westerlund* controls "unless the intent of the trial court is material" is some evidence that his intent was to sever the tenancy. Also, it should be noted that his order to sell the property and divide the proceeds apparently contemplated a sale forthwith, which would have severed the joint tenancy almost immediately following the judgment.

Thus, there is evidence that, had Judge Jones felt his intent was relevant and controlling, he would have held that his intent was to sever the tenancy. On the other hand, it is clear that he could have severed the tenancy expressly as a part of the judgment had he intended that result. Moreover, at the hearing on the alleged contempt, when given an opportunity to clarify his intent, he failed to declare affirmatively that such was his intent.

If we were faced with a situation in which we could with reasonable certainty determine from the record either the intent of the parties or of the judge, it would be appropriate for this court or the court of appeals

to give effect to that intent. Here the evidence of intent is equivocal. In this situation we conclude that it is necessary and appropriate to remand the cause to the trial court for a determination of the trial court's intent at the time of the judgment. We order such remand. In so doing, we recognize in some cases the possible inadequacy of the remedy we direct.

The task of determining whether a joint tenancy is to be severed or other property is to be transferred initially and finally ought to be the trial judge's. The trial judge should explicitly adjudicate the status of any property held jointly or otherwise; and in the event of a divestiture or transfer of title, the court should specifically direct the parties to prepare the judgment in a form readily recordable in the office of the register of deeds. The party bearing the responsibility for such recording should be directed by the court to record such portions of the judgment.

In the present case, however, we know of no reason why Judge Jones cannot ascertain his intent or lack of intent at the time of the rendering of the judgment. We note that judges retire, die, or are unavailable to give after-the-fact explications of their judgments. Hence, we stress the necessity of divorce courts making explicit determinations at the time of judgment in order to avoid either the reexamination of the question at a later time or the attempts of the appellate court or of this court to ascertain intent from a less than complete record.

We cannot forecast from this record whether Judge Jones will determine that the tenancy was not severed and Vallerie Lutzke, therefore, became the sole owner upon the death of her husband or whether, from the time of the divorce order, there was merely a tenancy in common with no right of survivorship.

We are obliged to give some guidance to the trial court in the event of the possible alternative decisions.

The first question that must be addressed by the trial court in the event it is concluded that Vallerie Lutzke takes by right of survivorship is whether she is nevertheless compelled by the divorce judgment to sell the property. The estate of William Lutzke contends that, even if the survivor of the joint tenancy assumes sole ownership, she is personally obligated by the divorce decree to sell the property and distribute the proceeds in accordance with the direction of the judgment. Because in this respect also the court's intention is unclear, we order that this matter be clarified by the court on remand.

The wife's response to the assertion of William J. Lutzke, personal representative, assumes that, if she is the sole owner, she is entitled to all of the proceeds of a sale. She contends that it would be foolish to compel her to sell the home only to distribute the proceeds to herself. Alternatively, she claims that, if she can satisfy her creditors without selling the home, she should be permitted to do so. It appears to be her assumption that, at the least, she is personally obligated to pay the estate of her husband the amounts set forth in the judgment.

The estate's argument is based on an analysis similar to that employed by the Supreme Judicial Court of Maine in *Fitzgerald v. Trueworthy*, 476 A.2d 183 (Me. 1984). In *Fitzgerald,* the parties to the divorce owned a home in joint tenancy. A divorce judgment awarded possession of the home to the wife until all the children had finished or terminated high school. At that time, the house was to be sold and the proceeds equally divided. The couple did not sell the home prior to the death of the husband. Shortly after his death, all of the children either finished or terminated their high school education. The estate of the husband sued the wife to enforce the divorce judgment by ordering a sale of the

residence. The superior court held that the death of the husband did "not alter the effect of the *in personam* judgment requiring sale" and that the wife remained bound by the order of the divorce court to sell the property. 476 A.2d at 184. The supreme judicial court affirmed the superior court.

In contrast to cases such as *Nichols v. Nichols,* 43 Wis. 2d 346, 168 N.W.2d 876 (1969) ; *Renz v. Renz,* 256 N.W.2d 883 (N.D. 1977) ; *Mann v. Bradley,* 188 Colo. 392, 535 P.2d 213 (1975) ; *Thomas v. Johnson,* 12 Ill. App. 3d 302 (1973) ; and others discussed or cited above, *Fitzgerald* did not frame the issue as whether the divorce court or the parties intended to sever the joint tenancy. Instead, *Fitzgerald* viewed the issue as whether the divorce court intended to create an *in personam* obligation on the wife to sell the property and share the proceeds with her ex-husband. *Fitzgerald* found that the divorce judgment was "perfectly clear" (476 A.2d at 186) and did intend to create that obligation regardless of the form of legal title:

"Least of all does the judgment suggest that the obligation of one spouse to sell and share the proceeds was affected at all by the death of the other divorced spouse. On the contrary, the personal duty of both the husband and the wife to carry out the division of the marital property equally between them depended upon a single triggering event, the end of the Fitzgerald children's secondary education. The divorce judgment in imposing that personal duty upon both parties was completely blind to the exact status of the legal title to the premises ; it made no difference whether either one was the sole title holder or they held it as tenants in common or joint tenants. When the time came to effect the even division, whichever of them held the legal title in whole or part was obligated by court order to carry out the partition by sale." 476 A.2d at 185–86.

Even acepting the analysis of the *Fitzgerald* court as correct—that the necessary inquiry is whether the

divorce court intended to create a personal obligation on the parties to sell[5] and not whether the divorce court intended to sever the joint tenancy—the intent of the divorce court remains the critical question. We do not find Judge Jones' intent any clearer when viewed from the *in personam* obligation perspective of the *Fitzgerald* court. Just as it is unclear from the divorce judgment, read in conjunction with the "Memorandum Decision and Order Dismissing Petition to Find Respondent in Contempt," whether Judge Jones intended to sever the joint tenancy at the time of the divorce, it is equally unclear whether he intended to create a personal obligation to sell the home regardless of the form of ownership. On one hand, he unconditionally ordered the parties to sell the property, which suggests an intent to create such an obligation. On the other hand, he refused to find the wife in contempt for failure to sell, which suggests he did not intend to create a personal obligation. In other words, the same facts that obscure Judge Jones' intent regarding the severance of the joint tenancy obscure his intent regarding the creation of a personal obligation to sell. Consequently, even when we accept the *Fitzgerald* court's focus on whether the divorce court intended to create a personal obligation to sell or focus on whether the divorce court intended to sever the joint tenancy and terminate the right of survivorship, the result is the same: The case must be remanded because it is not clear what Judge Jones intended to do.

Under the rationale of *Fitzgerald,* the question is whether, if the tenancy was not terminated until the death of William Lutzke, Vallerie Lutzke, although acquiring full title to the property as the survivor, was

---

[5] A Wisconsin court can exercise either personal jurisdiction or quasi *in rem* jurisdiction in divorce cases. *See,* secs. 801.06, 801.07 (5), Stats.

nevertheless personally obligated to pay the charges set forth in the judgment. If there was a severance at the time of the judgment, the same question persists—although Vallerie Lutzke took title to the property by virtue of the judgment as a tenant in common, does she not, nevertheless, remain personally liable for the charges even though she acquired by the judgment only a divided one-half of the estate as a tenant in common.

We are unable, on this appeal, to do more than pose the problem. The resolution depends upon the trial judge's intent to impose or not impose upon Vallerie Lutzke an *in personam* obligation.

While the parties have invited us to explore whether, under the possible alternatives of Judge Jones' yet-to-be-reached decision, there will be, variously, an unexecuted judgment for these costs, loan, and inheritance, an express lien,[6] a constructive trust,[7] or an equitable lien, we decline to plumb in depth these hypothetical situations. All are dependent upon a judicial decision based upon an intention which as yet has not been expressed with clarity. It appears to us that, in the event Judge Jones declares the intent of the judgment—whether the obligation is personal or not, whether the joint tenancy was severed or not—he will then be in a

---

[6] Sec. 767.30, Stats., which provides for imposition of attorneys fees upon the party liable and also requires recordation of the judgment for the fees ordered to become a charge upon specific real estate.

[7] A constructive trust appears to be out of the question as we view the facts of the case as now presented to us. Under Wisconsin law, a constructive trust requires that title to property on which the constructive trust is imposed be obtained by wrongdoing. *Wilharms v. Wilharms*, 93 Wis. 2d 671, 678, 287 N.W.2d 779 (1980). If Judge Jones determines that Vallerie Lutzke is the sole owner by right of survivorship, her title is the consequence of the judgment of the court, not by any wrongdoing. Judge Jones recognized the appropriate rule of law in his decision on the alleged contempt.

position to state with specificity the nature of the obligation and whether it is a mere judgment debt or whether it results in some security lien upon whatever share of the property inures to Vallerie Lutzke. *See, Wozniak v. Wozniak,* 121 Wis. 2d 330, 359 N.W.2d 147.

In summary, then, we conclude that sec. 767.255, Stats., as revised subsequent to *Nichols,* does not mandate a termination of a pre-divorce joint tenancy between the divorcing parties. Whether a divorce judgment has the effect of terminating such a tenancy is dependent upon either the expressed intent of the parties, usually revealed by stipulation, or by the intent of the divorce judge. In the instant case, the parties reached no agreement, express or tacit, in respect to the disposition of the real property, and Judge Jones' intent appears ambiguous and equivocal, subject to various interpretations, depending upon the emphasis which is placed upon various expressions in the record. We therefore remand the cause to Judge Jones to clarify his intent at the time of rendering the judgment regarding the status of the joint tenancy following the divorce judgment.

Because the intent of Judge Jones in respect to the nature of the financial obligation arguably imposed upon Vallerie Lutzke by the judgment is in doubt, we require clarification in that respect also. Subsumed in that inquiry is whether there was an *in personam* obligation imposed upon Vallerie Lutzke by the directive of the court and whether, if such obligation were imposed, it was to be secured in any way by the real estate itself.

Accordingly, we vacate the order of the circuit court which declared that Vallerie Lutzke became the sole owner of the joint tenancy of the parties and that she became so free and clear of any of the financial obligations, personal or secured, referred to in the divorce judgment. We do so because there has not been an appropriate determination of the intent of the trial court in respect to these issues.

*By the Court.*—Order of the circuit court for Manitowoc county is vacated and the cause is remanded for further consideration consistent with this opinion.

SHIRLEY S. ABRAHAMSON, J. (concurring). While I concur in the result, I write separately because I am concerned that the majority may not have given the trial court adequate guidance upon remand.

The majority vacates the order of the circuit court and remands the cause to Judge Jones to clarify his intent at the time of rendering the judgment regarding the status of several issues: the nature of the ownership of the property (*i.e.,* joint tenancy or tenancy in common) following the divorce judgment, the nature of the obligation to sell, the financial obligation imposed upon Vallerie Lutzke, and whether—if a financial obligation were imposed—it was to be secured. (P. 49.)

The majority also states that "[i]n the present case . . . we know of no reason why Judge Jones cannot ascertain his intent or *lack of intent* at the time of the rendering of the judgment." (P. 44.) (Emphasis added.) The majority thus recognizes that the trial judge, like the parties, may "have formed no intent, expressly or impliedly, in respect to severance as a part of the divorce itself." (P. 42.)

The majority does not say, however, what the trial judge is to do on remand if, in fact, he did not, at the time of the original judgment, have an intent with regard to any of the specific issues for which we remand. I would have preferred that this court expressly instruct the trial judge that if, at the time of rendering of the judgment, he had formed no intent on these issues, his function, upon remand, is, insofar as possible, to reconstruct his original dispositional scheme for the property division and to issue an order harmonizing the original

dispositional scheme with the husband's subsequent death.

I am authorized to state that JUSTICE WILLIAM G. CALLOW and JUSTICE DONALD W. STEINMETZ join this concurrence.